UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
OLEG KORSUNTSEV,

                Petitioner,

                      **MEMORANDUM & ORDER**
      v.                                      23-CV-3208 (RPK)

PHILIP MELECIO,

                Respondent.
-----------------------------------------------------------------x

RACHEL P. KOVNER, United States District Judge:

Petitioner Oleg Korsuntsev is currently serving a seven-year term of imprisonment after being convicted of first-degree attempted assault in New York state court. The state appellate court affirmed petitioner's conviction on direct appeal, and he unsuccessfully sought state post-conviction relief. Petitioner now files a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254, contending that his Confrontation Clause rights were violated when the trial court admitted the prior testimony of an unavailable witness. The petition is denied.

## BACKGROUND

### I. Factual Background

The following facts are taken from the state court record, viewed in the light most favorable to the prosecution. *See McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (per curiam).

On March 20, 2016, while his car was stopped at an intersection in Brooklyn, Agzam Abdulmazhitov looked out his window and saw a man, later identified as petitioner, grab a woman by the head and punch her. Tr. 87–91.[1] Abdulmazhitov called out to petitioner to stop. *Id.* at 91–93. Petitioner let the woman go, approached the car, and stabbed Abdulmazhitov in the left torso

---

[1] Tr. refers to the trial transcript, which is docketed over multiple exhibits. *See* Dkts. #4-1 to 4-6.

and right hand. *Id.* at 93–96. Abdulmazhitov was transported to the hospital where he was treated for his injuries, including a collapsed lung. *Id*. at 457–60.

Over the following months, Abdulmazhitov assisted law enforcement with identifying petitioner as his assailant, including by identifying him in a lineup. *See, e.g.*, *id.* at 431–32, 435–36, 588–89. After an arrest card was issued for petitioner, petitioner voluntarily turned himself in and was charged with attempted assault in the first degree, assault in the second degree, and related lesser crimes. *See id.* at 583–84; Aff. in Opp'n ¶ 4 (Dkt. #4).

**II.   State Court Trial**

Petitioner was tried three times. The first two trials ended in mistrials, due to the disappearance of a juror and then to the illness of defense counsel. *See* Aff. in Opp'n ¶ 5. Petitioner's third trial commenced on January 7, 2019, and concluded on January 22, 2019 with a conviction. *See id.* ¶ 12; Tr. 952.

As relevant to the present petition, petitioner's former girlfriend, Sabrina Nicoletti, testified at petitioner's first trial that petitioner confessed to her that he was the assailant. Specifically, Nicoletti testified to the following:

- When Nicoletti and petitioner met and started dating in 2017, petitioner confided in Nicoletti that he was involved in a pending legal matter but provided no details. Tr. 669–72. In August 2017, Nicoletti learned that petitioner had three children and another romantic partner, Olga Medova. *Id.* at 673. When Nicoletti confronted petitioner, he told Nicoletti he had recently been in touch with Medova because she was going to be a witness in his case, and he did not want her to say anything bad about him. *Id.* at 690. Petitioner told Nicoletti that Medova had witnessed him attack and beat someone outside Medova's apartment building so badly that he had to be hospitalized. *Id.* at 675–77. During a subsequent conversation, petitioner confirmed to Nicoletti that he committed the crime and that the victim had identified him in a lineup. *Id.* at 677.

- Nicoletti attempted to distance herself from petitioner, and he became aggressive towards her. He would arrive at her house uninvited, kick and bang on the door, and demand to be let in. *Id.* at 678, 689. Petitioner's actions dissuaded Nicoletti from coming forward as she feared for her safety. *Ibid.* As of February 15, 2018, Nicoletti

2

and petitioner were no longer together, but at the time she testified in March 2018, she was three months pregnant with petitioner's child, which made it more difficult for her to come forward against him. *Id.* at 679–81, 685, 689. Regardless, Nicoletti reached out to the District Attorney's Office and ultimately testified for her own safety because "someone like [petitioner] shouldn't be walking around the streets." *Id*. at 683–84.

By the time of the third trial, Nicoletti had relocated to California. Believing they would be unable to secure Nicoletti's appearance at the third trial, the prosecution moved under New York Criminal Procedure Law Section 670.10 to have Nicoletti's testimony from the first trial read into evidence. *See* Aff. in Opp'n ¶ 6. The defense opposed the motion on the grounds that the prosecution had not been diligent in securing Nicoletti's appearance at the third trial. *Ibid.* On January 14, 2019, in the midst of trial, the trial judge held a hearing on the prosecution's diligence in attempting to secure Nicoletti's appearance. *See* Tr. 333. At the hearing, Detective Investigator ("D.I.") Alfredo Nunez testified about the efforts undertaken by the state to secure Nicoletti's presence during all three trials, as follows:

- Prior to the first trial, Nicoletti reached out to a trial prosecutor about what she knew. While she was reluctant to speak with prosecutors and hesitant to testify against petitioner, Nicoletti ultimately complied with a subpoena and testified during the first trial. *Id.* at 337–38.

- For the second trial, Nicoletti indicated that she was not willing to testify so D.I. Nunez sought a Material Witness Order to secure her presence, but it was never executed because a mistrial was declared. *Id.* at 339–40.

- On January 6, 2019, D.I. Nunez conducted a background check on Nicoletti to locate her for the third trial. *Id.* at 346. Nicoletti had a car registered in New York and the contact information D.I. Nunez found for her was also based in New York. *Id.* at 347. On January 8, D.I. Nunez attempted to serve Nicoletti with a subpoena to appear in court on January 11, but he was unsuccessful. *Id.* at 343. D.I. Nunez learned from the superintendent of Nicoletti's apartment building in Brooklyn that she no longer lived in New York. *Id.* at 349. Upon further investigation, D.I. Nunez learned that Nicoletti had relocated to Los Angeles. *See id.* at 349–50.

- Nicoletti reached out to D.I. Nunez on January 11, 2019, telling him that she was not going to come back to New York and that he needed "to stop bothering people that she knew." *Id.* at 351. D.I. Nunez persuaded her to speak with the prosecutor, to whom she reiterated that she did not want to have anything to do with the case, that she was

3

> unavailable because she no longer lived in New York, and that under no circumstances would she be returning. *Id.* at 351–52.

- Nicoletti refused to provide D.I. Nunez with her address, so he suggested that she go to a local police precinct and have an officer there contact D.I. Nunez to at least confirm her location. *Id.* at 353. Shortly thereafter, D.I. Nunez received a call from Officer Kevin Fowler of the Indio Police Department, a city southeast of Los Angeles. *Id.* at 354. Nicoletti was present at the police station during the call, and Officer Fowler confirmed to D.I. Nunez that she was living out of her car. *Ibid.* Without an address, it would be nearly impossible for D.I. Nunez to locate Nicoletti, particularly in light of the fact that she was living in her vehicle and therefore completely mobile. *Id.* at 355–56.

Meanwhile, while the motion to permit Nicoletti's prior testimony under Section 670.10 was pending, the prosecution continued to make efforts to bring Nicoletti to New York. On January 11, 2019, the prosecution had applied for a certificate to secure Nicoletti's attendance as a material witness pursuant to N.Y. Criminal Procedure Law Section 640.10, on the grounds that Nicoletti expressed fear and reluctance to testify during the first two trials and had stated on several occasions since the second mistrial occurred that she would not testify again. *See* Aff. in Opp'n ¶ 21. The trial court issued a certificate pursuant to Section 640.10, stating that Nicoletti "cannot be expected to be amenable to service of process to compel her attendance at the trial of this matter in New York" and "recommended that [she] be taken into immediate custody by the appropriate law enforcement agency in California, and be delivered to the custody of detective investigators from the Kings County District Attorney's Office." Ex. G to Resp., Certificate Under C.P.L. § 640.10, at ¶¶ 3–4 (Dkt. #4-7); *see* Aff. in Opp'n ¶ 22.

An investigator with the Los Angeles County District Attorney's Office located Nicoletti and served on her a subpoena to appear in Los Angeles County court on January 15, 2019. Tr. 526, 528. Nicoletti appeared in the California court and was ordered to make immediate travel arrangements to attend the trial in New York. *Id.* at 634. The California judge declined to take Nicoletti into custody, however, and instead directed Nicoletti to travel on her own accord. *Id.* at

4

636–42.  Nicoletti called the trial prosecutor after she left the Los Angeles court and told him that she would not be returning to New York, even if the state covered her expenses.  *Id.* at 634.  She stressed that she wanted nothing to do with petitioner's case and claimed to have forgotten her previous testimony: "If you bring me in cuffs, I will go off on a tangent, I will talk about anything other than this case, I will not testify for you guys."  *Id.* at 635; *see id.* at 634–42.

After Nicoletti made clear that she would not appear at trial, the trial court granted the prosecution's motion to introduce Nicoletti's prior testimony pursuant to Section 670.10, laying out four specific reasons for its decision.  *See* Aff. in Opp'n ¶ 30.  First, "the District Attorney's Office went to extraordinary lengths and pains to locate the witness in California, and to have her brought before a judge on an application for an out-of-state witness order . . . within plenty of time to have secured her testimony at trial, had she cooperated with the California Judge and directive to return to New York voluntarily."  Tr. 650.  Second, the California court's decision not to place Nicoletti into custody was outside the prosecution's control and, "although they could have moved more quickly . . . to realize she was in California, as it turned out that made no difference at all."  *Id.* at 650–52.  Third, the same attorney who represented petitioner in the third trial had fully cross-examined Nicoletti during the first trial, "so it's kind of the gold standard."  *Id.* at 652.  Fourth, there was "no strategic preference being exercised here, since the District Attorney's Office was clearly prepared to fly her here today and greet her when she came off the plane and take whatever happened when she testified.  What the law requires is due diligence, not every conceivable effort."  *Id.* at 653.

Accordingly, Nicoletti's testimony from the first trial was read into evidence during the third trial.  *Id.* at 667.  At the conclusion of trial, the jury returned a verdict of guilty on the charge

5

of attempted assault in the first degree. *Id.* at 952. The trial court sentenced petitioner to seven years in prison followed by three years of post-release supervision. Aff. in Opp'n ¶ 66.

### III. Post-Conviction Proceedings

Petitioner appealed his conviction to the New York Supreme Court, Appellate Division, Second Department ("Appellate Division"), arguing that the trial court erred in allowing Nicoletti's prior testimony into evidence because her unavailability "was the direct result of the [prosecution's] failure to exercise due diligence in securing her presence." *See* Appellant's Br. on Appeal 1–3 (Dkt. #4-7). Specifically, petitioner alleged that (1) the prosecution waited until the last minute to attempt to locate and contact Nicoletti, (2) the trial court erroneously concluded that Nicoletti's failure to appear was beyond the prosecution's control, (3) the conclusion that the prosecution's failure to exercise due diligence made no difference was clearly erroneous, and (4) admitting Nicoletti's prior testimony was not harmless error. *See id.* at 2–50.

The Appellate Division affirmed petitioner's conviction, finding that the trial court "providently exercised its discretion" because the witness was out of state and could not with due diligence be brought before the New York trial court. *People v. Korsuntsev*, 169 N.Y.S.3d 852, 852 (App. Div. 2022). It agreed with the trial court that "the People's failure to produce the witness was not the result of a strategy to avoid confrontation" and "[i]ndeed, the same trial attorney for [petitioner] cross-examined the witness at the first trial regarding the same charges." *Id.* at 852–53. Accordingly, the Appellate Division held that there was no error and that "a transcript of the witness's prior testimony was properly admitted into evidence." *Ibid.* The New York Court of Appeals denied petitioner leave to appeal the Appellate Division's decision. *People v. Korsuntsev*, 198 N.E.3d 781 (N.Y. 2022) (Troutman, J.).

6

Petitioner filed additional post-conviction pleadings in state court, including a motion to set aside his sentence and a N.Y. Criminal Procedure Law Section 440.10 motion to vacate his judgment of conviction. Both motions were denied by the trial court, but neither directly raised nor referenced the issue addressed on direct appeal and now presented for federal habeas review.

Petitioner timely filed the instant petition for a writ of habeas corpus under 28 U.S.C. § 2254, wherein he claims that the admission of Nicoletti's prior testimony violated his Sixth Amendment Confrontation Clause rights. *See* Pet. 5 (Dkt. #1); Reply to Aff. in Opp'n ("Reply") 7–14 (Dkt. #6).

## STANDARD OF REVIEW

A person in custody pursuant to a state-court judgment may seek a writ of habeas corpus on the ground that he is being held "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under Section 2254, subject to exceptions not applicable here, a federal court may review a petitioner's claims only if the applicant has exhausted the remedies available to him in the courts of his state. *Id.* § 2254(b)(1)(A). "State remedies are deemed exhausted when a petitioner has: (i) presented the federal constitutional claim asserted in the petition to the highest state court . . . and (ii) informed that court (and lower courts) about both the factual and legal bases for the federal claim." *Ramirez v. Att'y Gen. of State of N.Y.*, 280 F.3d 87, 94 (2d Cir. 2001) (citing *Picard v. Connor*, 404 U.S. 270, 276–77 (1971)).

Federal review of state convictions is circumscribed by the related doctrine of procedural default. "[A] claim is procedurally defaulted for the purposes of federal habeas review where 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Reyes v. Keane*, 118 F.3d 136, 140 (2d Cir. 1997) (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 (1991)) (emphasis omitted). "Out of respect for finality, comity,

and the orderly administration of justice," federal courts generally may not entertain such defaulted claims through habeas unless the petitioner shows "cause and prejudice to excuse the default." *Dretke v. Haley*, 541 U.S. 386, 388 (2004). A state prisoner who fails to make those showings can only receive habeas review if he "advance[s] . . . a credible and compelling claim of actual innocence," *Hyman v. Brown*, 927 F.3d 639, 656 (2d Cir. 2019) (quoting *Rivas v. Fischer*, 687 F.3d 514, 540 (2d Cir. 2012)), such that "failure to consider the claim[] will result in a fundamental miscarriage of justice," *Coleman*, 501 U.S. at 750.

AEDPA also constrains federal review of claims that have been preserved. So long as a state court adjudicated a litigant's claim on the merits, a federal court may grant habeas relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

"Clearly established Federal law" refers to "the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (alterations omitted) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). A state court decision is "contrary to" clearly established federal law as determined by the Supreme Court if it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A decision involves an "unreasonable application" of clearly established federal law if the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case," *ibid.*, meaning there is "no possibility fair-minded

8

jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).  Finally, a determination that a state-court decision was "based on an unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2), requires more than that a federal court conducting habeas review "would have reached a different conclusion in the first instance," *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015) (quotation marks omitted) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).  "If the state record is 'ambiguous' such that two different views of the facts find fair support in the record," AEDPA "mandates deference to the state court's fact-finding." *Washington v. Schriver*, 255 F.3d 45, 55 (2d Cir. 2001) (citation omitted).

These standards are "intentionally difficult to meet," *Woods v. Donald*, 575 U.S. 312, 316 (2015) (citation and quotation marks omitted), because federal habeas review is "a 'guard against extreme malfunctions in the state criminal justice systems,'" not "a means of error correction," *Greene v. Fisher*, 565 U.S. 34, 43 (2011) (quoting *Richter*, 562 U.S. at 102–03).

## DISCUSSION

Petitioner fails to demonstrate that the state court's decision regarding the introduction of Nicoletti's prior testimony was contrary to or an unreasonable application of clearly established federal law.  Accordingly, his petition for a writ of habeas corpus is denied.

"Supreme Court law clearly establishes that, under the Sixth Amendment's Confrontation Clause, a criminal defendant must have a meaningful opportunity to cross-examine witnesses against him." *Alvarez v. Ercole*, 763 F.3d 223, 229–30 (2d Cir. 2014) (citation and quotation marks omitted).  "Testimonial statements of witnesses absent from trial [are] admi[ssible] only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine the witness." *Crawford v. Washington*, 541 U.S. 36, 59 (2004).  The government must establish the declarant's unavailability. *Ohio v. Roberts*, 448 U.S. 56, 74–75 (1980),

9

*overruled on other grounds by Crawford*, 541 U.S. at 68–69. A witness is not "unavailable" for the purposes of this exception to the Confrontation Clause "unless the prosecutorial authorities have made a good-faith effort to obtain [her] presence at trial." *Barber v. Page*, 390 U.S. 719, 724–25 (1968). The Supreme Court has explained that "[t]he lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness," *Hardy v. Cross*, 565 U.S. 65, 70 (2011) (per curiam) (quoting *Roberts*, 448 U.S. at 74), and has cautioned that "the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising," *id.* at 71–72. Indeed, the deferential standard of review set out in AEDPA "does not permit a federal court to overturn a state court's decision on the question of unavailability merely because the federal court identifies additional steps that might have been taken." *Id.* at 72. "[I]f the state-court decision was reasonable, it cannot be disturbed." *Ibid.*

Here, the state court's decision on the question of Nicoletti's unavailability was reasonable. As detailed above, the trial court heard evidence of the extensive efforts taken by the state to locate Nicoletti and bring her in to testify at the third trial. After learning that Nicoletti had relocated from New York to Los Angeles, D.I. Nunez attempted to reach Nicoletti and contacted law enforcement officers in California in hopes of confirming her location. When that proved fruitless, the prosecution sought and the trial court issued a Section 640.10 certificate requesting that a California court aid in securing Nicoletti's return to New York to appear for petitioner's trial, going so far as to ask the California court to take Nicoletti into custody to ensure her return. When the California court declined to take her into custody, Nicoletti contacted the trial prosecutor and stated that she would not be returning to New York under any circumstances and that even if she were brought to the trial in handcuffs, she still would not testify. The state court also reasonably concluded that the prosecution's "failure to produce [Nicoletti] was not the result of a strategy to

10

avoid confrontation on the witness stand." *Korsuntsev*, 169 N.Y.S.3d at 852–53; *accord* Tr. 653. Rather, the trial record demonstrates that the prosecution was "clearly prepared to fly [Nicoletti]" to New York and "take whatever happened when she testified." Tr. 653.

Petitioner argues that the prosecution failed to exercise due diligence by waiting until after the third trial started to attempt to locate Nicoletti, *see* Pet. 50–51; Reply 9–10, and that contrary to the trial court's conclusion, the prosecution's delay made a difference in the outcome, *see* Pet. 55. This argument is factually inaccurate, as D.I. Nunez testified that he began efforts to locate Nicoletti before trial commenced. *See* Tr. 346. Moreover, in examining the question of unavailability, the Supreme Court has "focused on the *extent* of the government's effort" and has not "indicated that it considered the *timing* of the government's effort to be of particular significance." *United States v. Casamento*, 887 F.2d 1141, 1170 (2d Cir. 1989) (discussing *Roberts*, 448 U.S. at 74–77); *see ibid.* (holding witness "was unavailable . . . although the government's effort to procure him was made after the trial began"); *Wiggins v. Greiner*, 132 F. App'x 861, 863 (2d Cir. 2005) ("In light of *Casamento,* we can hardly conclude that the state courts unreasonably applied *Roberts* in focusing on the extent, rather than the timing, of the prosecution efforts to locate the missing eyewitness.").

Petitioner also argues that the prosecution's application for a certificate pursuant to N.Y. Criminal Procedure Law Section 640.10 did not ask the California court to take Nicoletti into custody, thus rendering erroneous the state court's conclusion that the California court's decision not to take Nicoletti into custody was outside the prosecution's control. Pet. 53–54. However, the Section 640.10 certificate explicitly "recommended that Sabrina Nicoletti be taken into immediate custody by the appropriate law enforcement agency in California," noting that "[b]ased on

11

representations of the People," merely ordering her to return to New York would be insufficient. Ex. G to Resp., Certificate Under C.P.L. § 640.10, at ¶¶ 3–4.

As such, petitioner's arguments are unpersuasive, and petitioner has not demonstrated an entitlement to federal habeas relief.

## CONCLUSION

For the foregoing reasons, the petition is denied. And because petitioner has not shown "that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further,'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)), a certificate of appealability under 28 U.S.C. § 2253(c)(2) is also denied. The Clerk of Court is directed to enter judgment and close the case.

SO ORDERED.

                                              */s/ Rachel Kovner*
                                              RACHEL P. KOVNER
                                              United States District Judge

Dated:     September 25, 2024
             Brooklyn, New York